JOHN M. BAKER et al. v. EVA K. THOMPSON et al., Appellants.

Division One, November 25, 1908.

1. LIMITATIONS: Notice to Wife's Husband. If the husband of the wife who owned certain land was her agent in looking after and managing it, and practically all the possessory acts performed upon the parcel in suit to which she had no paper title were performed by him, notice to him of an arrangement entered into by prior adjoining owners that, for purposes of convenience, the wife's grantor should use the small parcel in suit in exchange for the use of a like parcel by the other adjoining owner, to be terminated at any time by either party thereto, was notice to her.

2. ———: ———: Evidence of Agency. Where there is substantial evidence that the husband was the agent of the wife in the management and control of her farm, the court did not err in submitting the question of agency to the jury, and in instructing them that if he or she through him had notice of the prior arrangement between her grantor and the adjoining owner for the use by the adjoining owner of the small parcel of her land in exchange for the use by her grantor of the small parcel of the adjoining owner's land in controversy, and

that said arrangement was to be terminated at any time by either party, then she must by some unequivocal act have brought to the knowledge of the adjoining owner that such arrangement was terminated before the Statute of Limitations would begin to run in her favor.

3. ————: **Necessary Proof.** Before the Statute of Limitations can be put in motion the party claiming the benefit thereof must show an intention, either by words or acts, to claim the title to the land by adverse possession. Either actual occupancy, or constructive possession under colorable title, must be shown.

4. ————: **Not Claimed: Title by Will.** Where the devisee does not claim title to the disputed parcel by adverse possession, but claims it solely by her father's will, and that will does not devise the parcel to her, although it was at the time inclosed with the land actually devised to her, as a part thereof, she cannot recover or retain such parcel.

Appeal from Clinton Circuit Court.—*Hon. A. D. Burnes,* Judge.

AFFIRMED.

*F. B. Ellis* for appellants.

(1) The court erred in permitting conversation to be introduced in evidence of John B. Thompson concerning the boundary lines of his wife's farm in her absence. These conversations were prejudicial and improper. The conversation of third parties of the husband concerning the title of his wife's land or the possession thereof are never admissible against the wife in a suit for the possession of her lands. John B. Thompson was the codefendant of his wife, artistically made so by ingeniousness of plaintiffs' counsel. And the admissions of a party to a suit confessing away the title of his codefendant are never admissible against his codefendant for that purpose. The conversations of Thompson with Shepherd, Guyer and Baker were in the absence of Mrs. Thompson. Hambright v. Brockman, 59 Mo. 57; Darrett v. Donnelly, 38 Mo. 492. No declarations of John B. Thompson concerning his wife's land could bind her even while

he was living on the premises with her. Even his deed could not have affected her. Certainly he could not do by conversations with third parties what he could not do by deed. Fox v. Windes, 127 Mo. 512; Mueller v. Kaessmann, 84 Mo. 318; Lemons v. McKinney, 162 Mo. 530. (2) Plaintiffs' cause of action was and had been for many years barred by the Statute of Limitations. She knew nothing of the arrangements of Shepherd, Guyer, Kirk and others. She went into the possession of this land claiming to own the same since July, 1887. Her possession according to the undisputed evidence was adverse to all the world. She used this piece of land in connection with the rest of her farm. Adverse possession will entitle the defendants to a title. Warfield v. Lindell, 38 Mo. 562; Scruggs v. Scruggs, 43 Mo. 142; Fugate v. Pierce, 49 Mo. 441; Musick v. Barney, 49 Mo. 458; Key v. Jennings, 66 Mo. 367.

*W. S. Herndon* and *E. C. Hall* for respondents.

(1) The possession of defendant was a continuation of the possession of Kirk, her father, and Kirk's possession was a continuation of the Shepherd possession of the four-acre tract, and consequently defendant held all the time under the agreement made with Guyer, the original owner, and could not become adverse without an unequivocal act of hostility thereto brought home to Guyer. Hamilton v. Boggess, 63 Mo. 233; Budd v. Collins, 69 Mo. 129. (2) There was a privity of estate and in law between defendant and Kirk in respect to the possession of the land in controversy. Wash. on Real Prop. (3 Ed.), p. 263; 23 Am. and Eng. Ency. Law (2 Ed.), 101; State ex rel. v. St. Louis, 145 Mo. 567; Haley v. Bagby, 37 Mo. 364; Meier v. Meier, 105 Mo. 432; Hurt v. Adams, 86 Mo. App. 80; Pitzman v. Boyce, 111 Mo. 392. (3) The possession of the land in controversy by Shepherd was

with the consent of the owner, Michael Guyer. Shepherd sold to William Kirk, who took possession under Shepherd. Kirk died in possession and his daughter, Mrs. Thompson, and her husband went into possession under the will of her father. The possession was friendly at its inception and with the consent of the owner and in order to render the possession adverse, the party in possession must, by some unequivocal act, notify the owner that he holds adversely. Neither Shepherd, Kirk or either of the Thompsons ever notified Guyer that they claimed the land, and the verdict is for the right party. Gordon v. Eans, 97 Mo. 112; Handlan v. McManus, 100 Mo. 124; Meier v. Meier, 105 Mo. 411; Downing v. Dinwiddie, 132 Mo. 92; Hunniwell v. Adams, 153 Mo. 440; Stevenson v. Black, 168 Mo. 549; McCune v. Goodwillie, 204 Mo. 339; Coberly v. Coberly, 189 Mo. 16; Comstock v. Eastwood, 108 Mo. 41; Harper v. Morse, 114 Mo. 324. (4) The relation of landlord and tenant will not be inferred from occupation, if the relative positions of the parties to each other can be referred to any other distinct cause. Taylor, Landlord and Tenant (9 Ed.), sec. 25; Constant v. Abell, 26 Mo. 181; Coffman v. Hach, 24 Mo. 496. In this case the possession of Shepherd, Kirk and Thompson was that of licensee, determinable by a mere demand, and ejectment will lie without notice to quit. Taylor, Landlord and Tenant (9 Ed.), sec. 25. (5) The wife being *sui juris*, as to the land received from her father by will, could appoint an agent therefor. McFarland v. Heim, 127 Mo. 334; Turner v. Sham, 96 Mo. 28; 6 Ency. Ev., p. 864. (6) Agency may be proved by circumstantial evidence. 10 Ency. Ev., p. 21; Cusno v. Bowser Mill Co., 106 Mo. App. 236; Mosby v. McKee, 91 Mo. App. 500; Haubert v. Rea & Page Mill Co., 77 Mo. App. 672; Sharp v. Knox, 48 Mo. App. 169; Robertson v. Clevinger, 111 Mo. App. 622; Hull v. Jones, 69 Mo. 587;

Hoppe v. Saylor, 53 Mo. App. 4; Johnson v. Hurley, 115 Mo. 513. (7) Defendant, John B. Thompson, says in his answer that he is in possession of the land as the tenant of his wife. The evidence fails to show the existence of the relation of landlord and tenant, but it does show that he was in possession as the husband of his codefendant, Eva K. Thompson. This he had a right to under the law. She could only gain title by adverse possession, while they lived together, by his possession, and notice to him would, of itself, be notice to her—if any notice was required. Evans v. Kunz, 128 Mo. 679; Flesh v. Lindsay, 115 Mo. 1; Peck v. Lockridge, 97 Mo. 549; Mueller v. Kaessmann, 84 Mo. 318; Gray v. Dryden, 97 Mo. 106; Kanaga v. Railroad, 76 Mo. 214.

WOODSON, J.—This is an ejectment suit, instituted by plaintiffs against the defendants in the circuit court of Clinton county, to recover the possession of about four acres of land lying in the southwest corner of the northwest quarter of the southeast quarter of section 14, township 55, range 32.

The petition is in the usual form, and the answer was a general denial and a plea of the ten-year Statute of Limitations. The reply was a general denial of the new matter stated in the answer. A trial was had before the court and jury, which resulted in a verdict and judgment for the plaintiffs, and after taking the proper preliminary steps, the defendants duly appealed the cause to this court.

The facts of the case are few and simple, and most of them are undisputed.

The following plat introduced in evidence shows the tract of land sued for, and sheds much light upon the disputed issues involved in the case.

A—Land in Controversy.
B—Thompson land in Guyer's field.

In the year 1885 Charles W. Shepherd owned the southwest quarter of the southwest quarter of section 14, township 55, range 32 (which we will hereafter call the ''south forty''), and at the same time Michael Guyer owned the northwest quarter of the southwest quarter of same section, which lies immediately north of the ''south forty'' (which will hereafter be designated the ''north forty''). Shepherd was a son-in-law of Guyer, and by an agreement entered into by and between them Shepherd fenced in and occupied the tract of land in controversy, and left about the same amount of land in the northeast corner of the ''south forty'' in Guyer's possession; and it was also agreed between them that this arrangement might be terminated at any time by either party thereto and the fence put back on the true line between the two forties. The location of the railroad and branch through their lands, taken in connection with the boggy and miry condition of soil in and near the branch, suggested and induced both

of them to enter into said arrangement and construct the fences as above stated, which was for their mutual convenience and benefit.

Shepherd also owned the quarter section just west of the two forties and Guyer owned the lands on the east side thereof. A year or so after this arrangement had been entered into between them and after the fences had been constructed in pursuance of that agreement, Shepherd sold and conveyed his entire land to William Kirk by proper deed of conveyance. The latter went into possession and occupied the land until his death, which occurred something less than a year afterwards. By his last will Kirk gave all of his land to his daughter Eva K. Thompson, one of the defendants, for her sole and separate use. Mrs. Thompson rented the land to various persons up to about the year 1895 and collected the rents therefor. About the year 1895 she, with her husband and children, moved upon the land and have occupied and resided there ever since. The land in controversy was in the possession of Shepherd until he sold to Kirk, was in Kirk until his death, and was in the possession of Mrs. Thompson and her tenants up to the time of the bringing of this suit. John B. Thompson, her husband, and one of the defendants, has occupied the farm with her ever since they moved there in 1895, but he states in his separate answer that he has no interest in the land in controversy except as the tenant of his wife, Eva K. Thompson. The evidence, however, fails to show that she ever at any time rented the land to him. The "south forty" has been assessed to Mrs. Thompson and the taxes paid by her ever since it was willed to her, and the "north forty" has been assessed to Michael Guyer and the taxes paid by him from 1872 until this suit was brought. In February, 1904, Michael Guyer sold the "north forty" to the plaintiffs and executed a deed conveying the same to them.

All of the foregoing facts are practically undisputed, and the evidence for plaintiffs tended to prove that the plaintiff John M. Baker went to the defendant John B. Thompson and told him of his purchase, and requested him to show to him the line running east and west between the south and north forties, and that in pursuance to that request Thompson went down to the land and pointed out to Baker its location. This, however, was denied by Thompson. Soon after this Baker moved the fence back on the true line dividing the north and south forty, leaving the land in the northeast corner of the "south forty" in Thompson's enclosure and put back the land in controversy in Baker's enclosure. At the time Shepherd sold to Kirk he told the latter of the arrangement between him and Guyer regarding the occupancy of the two small tracts of land, and that the understanding was that either of them could, at will, move the fences back on the true line. The great weight of the evidence shows that John B. Thompson knew of this arrangement, and many facts and circumstances from which it might be reasonably inferred that Mrs. Thompson also knew of it, though each of them deny all knowledge of the said arrangement. Her brothers and all other parties interested in the premises knew of it. The evidence also tended to show that John B. Thompson was the agent of his wife in looking after and managing her farm, and that practically all of the possessory acts performed upon the land in suit were performed by him. He looked after the fences and water gaps and repaired them whenever necessary, and by permission from Guyer he broke up and put in cultivation the land in question. The record fails to show that Mrs. Thompson personally performed any acts indicating ownership of this land, except to take and hold the possession of the entire tract as enclosed

when she acquired title to the "south forty" through her father's will.

The evidence for Mrs. Thompson tended to show that she had no knowledge whatever of the existence of the arrangement between Shepherd and Guyer regarding the land in controversy.

Whatever additional facts may be necessary for a proper understanding of the case will be stated in the opinion.

I.   The cause was submitted to the jury on the theory that if they found from the evidence that Mrs. Thompson and her father, William Kirk, had notice of the arrangement made between Shepherd and Guyer regarding the land, then the appellants must have by some unequivocal act brought to the knowledge of Guyer that they claimed the land as their own before the Statute of Limitations would begin to run against the respondents; and that if they believed John B. Thompson was the agent of his wife in the management and control of the land, then notice to him would be notice to her.

It is first insisted that the action of the trial court in admitting evidence of conversations alleged to have taken place between John B. Thompson and various persons interested in the matter regarding the boundary lines of his wife's premises during her absence is reversible error.

Ordinarily the acts and words of the husband regarding his wife's property are no more binding upon her than they would be upon an entire stranger. This is academic and was so recognized by counsel for respondents; and in order to make his acts and words binding upon her, evidence was introduced tending to prove he was her agent in the premises.   The record discloses the fact that the "south forty" was her sole and separate estate, and even at common law

she could legally appoint an agent to manage and control it for her.   [MacFarland v. Heim, 127 Mo. 334.]

But in order to escape this rule counsel for appellants earnestly insists that the record fails to disclose any evidence of agency.   After a careful reading of this entire record, we are unable to lend our concurrence to that insistence.   There is a great mass of testimony bearing upon that question, and while it is not as direct and clear as it might be, yet we are fully satisfied that, when taken as a whole with all the inferences which may be reasonably drawn therefrom, it constituted sufficient evidence upon which to submit that question to the jury.   [Hull v. Jones, 69 Mo. 587.] The finding of the jury that the agency existed is conclusive upon this court, because it is supported by substantial evidence.   We are, therefore, of the opinion that the action of the court in admitting that evidence was not error.

We have carefully considered the instructions given by the court for the respective parties.   They, in our opinion, properly and fairly presented the law of the case to the jury; and we have no hesitancy in saying that their verdict is supported by the great preponderance of the evidence.

II.   But there is an additional valid reason why this judgment should be affirmed, and that is the record nowhere discloses any written or oral agreement or arrangement between Mrs. Thompson and her father regarding the land in question.   He made no adverse claims to the land and in no manner whatever authorized her to take possession of and occupy the same. That being true, then it must be conceded that she acquired no legal or colorable title to this land from her father, William Kirk.   So, in the light of the undisputed facts of this case her title must be determined wholly independent of her father's will and his possession of the land in dispute.   So, if she has title to these

four acres, it is because she has acquired title thereto by acts of real occupancy thereof for a period of ten years, unaided by paper or colorable title. Now, what are the facts regarding that matter as disclosed by this record? They are practically undisputed and are as follows:

Upon the death of William Kirk, the father of Mrs. Thompson, she, through her tenants, took possession of and occupied the farm willed to her, which consisted of the "south forty" and other lands. She also at the same time and by the same tenants took possession of and occupied the four acres in controversy, which were inclosed with the "south forty." She testified to and insisted throughout her entire testimony that she thought at all times that these four acres of land were willed to her by her father and that she owned the legal title thereto under and by virtue of the will. The following is almost a literal copy of her testimony upon that subject:

"Q. Now, after your father's death and when you moved on that place didn't you notice that this fence there on the north side of your forty—your house is on this forty? A. Yes, sir.

"Q. You noticed that fence didn't run straight but crooked in around next to the railroad, didn't you? You knew that fence wasn't on a straight line across the forty acres? A. No, sir, it wasn't right straight.

"Q. You saw the condition of the fence there? A. Yes, sir.

"Q. You heard your father's will read soon after his death. A. Yes, sir.

"Q. You knew when you saw this fence in the condition it was in that you had land there that was not described in that will, did you not? A. I never thought anything about it. I never claimed only what was in my enclosure.

"Q. Did you claim this piece of land south of the railroad? A. I claimed that in my enclosure.

"Q. Who did you make that claim to? A. Well, in my own family always. *I didn't have to make any claim. I always thought I owned it* and they always believed the same.

"Q. You thought, notwithstanding that fact that the will gave you this forty, that you owned the other? A. I never claimed any inside of Mr. Guyer's field.

"Q. Did you ever tell Mr. Guyer that you claimed this land in controversy? A. I never told him, for he never said nothing to me about it. I never had a word about it.

"Q. You never told him you claimed this land? A. I never told him and he never told me.

"Q. This fence was in the same condition it was when you went there clear up to the time Mr. Baker moved it on the northeast corner of the forty? A. The fence was the same way from the time I moved there.

"Q. Just like it was when your father lived there? A. Yes, sir.

"Q. Now, you understand that part of this forty-acre tract in the description of the land which your father willed to you was in Mr. Guyer's pasture? You testified to that fact before, didn't you? A. No, sir.

"Q. Didn't you say that part of this forty-acre tract was in Mr. Guyer's pasture? A. I never claimed any in Mr. Guyer's pasture.

"Q. I didn't ask you that, Mrs. Thompson. There was part of your forty-acre tract in his pasture. A. If there was I never knew it.

"Q. This is part of this forty acres here that Mr. Guyer sold to Mr. Baker, you know that, don't you? A. They are claiming four acres on my side they say. He says four acres of mine was on him and four acres of his on mine, but I never knew it.

"Q. I will ask you whether or not you knew that part of this forty-acre tract on which your house is situated, if before Mr. Baker moved his fence part of that forty was over in Mr. Guyer's pasture? A. No, sir.

"Q. Didn't you know that part of your land was in his pasture? A. No, sir, I did not.

"Q. Now, you testified in this case before. I will ask you if this question was asked you and if you made this answer: 'I believe you answered this question once, Mrs. Thompson, but to be sure about it I will ask you again: Did you know before this suit was commenced that this strip of land in the dotted line heretofore in the possession of Mr. Guyer was really willed to you? Did you know that before this suit was brought'? Ans. 'I supposed it was willed to me.' Was that question asked and did you make that answer? A. Well, I will have to read it again, please?

"Q. 'I believe you answered this question once, Mrs. Thompson, but to be sure about it I will ask you again: Did you know before this suit was commenced that this strip of land in the dotted line heretofore in the possession of Mr. Guyer was really willed to you? Did you know that before this suit was brought?' Ans. 'I supposed it was willed to me.' A. No, what was in Mr. Guyer's field I didn't think was willed to me. *Nothing only on my side.*

"Q. But did you make that answer before? A. I don't remember it if I did.

"Q. I will ask you if you claim these tracts, this one and this one over here? A. I don't claim anything on Mr. Guyer's side.

"Q. They are both in your enclosure now. A. I don't claim the piece that Mr. Baker threw on my side.

"Q. That was willed to you? A. *What was on my side I supposed was willed to me.*

"Q. Don't you know that you never have paid the taxes on this four acres over here? A. I supposed I was paying taxes on my side.

"Q. I will ask you if you ever have paid the taxes on this four acres in controversy? Now, what is your answer? A. Well, I don't know as I did on his side.

"Q. I will ask you if you ever, at any time, paid the taxes on this northwest of the southwest? This forty acres immediately north of the forty your father willed to you? A. Well, I could not tell you whether taxes was paid on his side or not.

"Q. Mr. Thompson gave in this land to the assessor, didn't he? A. Yes, sir, he did.

"Q. And he paid the taxes, did he not? A. Yes, sir, with my permission.

"Q. He paid them at all times with your permission, did he? Did you direct him to pay the taxes on the land in Mr. Guyer's field? A. No, I never directed him to pay on Mr. Guyer's side.

"Q. He gave the land in to the assessor for you, did he not? A. I suppose he did.

"Q. And signed his name to the assessment list? Did either you or Mr. Thompson ever give this four-acre in controversy in to the assessor? A. On Mr. Guyer's side?

"Q. The four acres in controversy here, on your side of the fence? A. Well, I don't know.

"Q. How is that? A. I don't know."

We have copied thus extensively from the testimony of Mrs. Thompson for the purpose of showing that she at no time claimed possession or title to the land in controversy by adverse possession, but her sole claim has at all times been, as before stated, that she acquired title to this land under and by virtue of her father's will, and that in pursuance to that

title she took possession of and has occupied it ever since.

We do not wish to be understood as holding that a person may not at one and the same time claim or acquire title to real estate both by deed or will and adverse possession, but we do hold that the proof of the one without more, as is true in this case, will not support the other. In the case at bar appellant's own evidence shows that her sole claim to the land was under and by virtue of her father's will, and when the undisputed evidence shows that the land is not embraced within the terms of the will, then her title in that regard must fail; and when we consider the plea of the Statute of Limitations we fail to find a scintilla of evidence which tends in the remotest degree to show she claimed this land by adverse possession. That being true her whole case must fall to the ground for want of evidence to support it upon either theory of her defense.

The law of this State is well settled to the effect that before the Statute of Limitations can be put into operation the party claiming the benefit thereof must show an intention either by word or acts to claim the title to the land by adverse possession. Either actual occupancy or constructive possession under colorable title must be shown. [DeBernardi v. McElroy, 110 Mo. 650.]

Finding no error in the record prejudicial to the rights of the appellants, the judgment should be affirmed.

It is so ordered.

All concur.